1  WO

6  IN THE UNITED STATES DISTRICT COURT
7  FOR THE DISTRICT OF ARIZONA

9  J. Christopher Carey,                          )   No. cv-05-2500-PHX-ROS
                                                  )
10            Plaintiff,                          )   **ORDER**
                                                  )
11  vs.                                           )
                                                  )
12                                                )
    Maricopa County, et al.,                      )
13                                                )
              Defendant.                          )
14                                                )
                                                  )
15  _____)

16   Pending before the Court is Defendant Chavira's Motion for Summary Judgment
17  (Doc. 324). For the reasons discussed herein, Defendant's Motion shall be granted in part
18  and denied in part.

19  I. BACKGROUND

20   Beginning in 2001, Plaintiff Dr. J. Christopher Carey, a physician, served as Chair of
21  Obstetrics and Gynecology with Defendant Maricopa Medical Center ("MMC") (an entity
22  within the Maricopa Integrated Health System ("MIHS")). He also served Residency
23  Program Director for the Phoenix Integrated Residency in Obstetrics and Gynecology
24  ("PIROG"), a residency program at MMC. His employment was pursuant to an employment
25  contract with MedPro, which in turn contracted with MMC.

26   The topic of abortion appears – to put it mildly – to have been a hotly contested one
27  in Plaintiff's workplace during his tenure. As part of the residency program that Defendant
28  supervised, PIROG allowed residents who were not opposed to obtain training in performing

1 abortions through a rotation at Planned Parenthood. In the summer of 2003, Dr. William
2 Chavira and Dr. Marcela Moffitt, both employed by MedPro, contacted Cathi Herrod at the
3 Center for Arizona Policy, a group with an anti-abortion focus, to discuss their opposition
4 to the Planned Parenthood rotation. Plaintiff alleges that this event sparked a variety of
5 actions against Plaintiff by Chavira, Moffitt, and others, designed to undermine his position
6 as PIROG director and OB/GYN Chair, including thinly veiled investigations against him.
7 On September 22, 2004, the Maricopa County Board of Supervisors removed Plaintiff from
8 his leadership positions at MMC; soon after, he negotiated a formal severance agreement
9 with MedPro.

10 Plaintiff now brings suit against a number of persons and organizations associated
11 with the end of his employment with MedPro, including Defendant Chavira. He alleges that
12 Chavira acted under color of state law in violating his First Amendment rights, defamed him,
13 and intentionally interfered with his contract with MedPro.

14 Defendant Chavira argues that each claim should be dismissed as a matter of law.

## II. STANDARD OF REVIEW

16 A court must grant summary judgment if the pleadings and supporting documents,
17 viewed in the light most favorable to the non-moving party, "show that there is no genuine
18 issue as to any material fact and that the moving party is entitled to a judgment as a matter
19 of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
20 Substantive law determines which facts are material, and "[o]nly disputes over facts that
21 might affect the outcome of the suit under the governing law will properly preclude the entry
22 of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In
23 addition, the dispute must be genuine; that is, "the evidence is such that a reasonable jury
24 could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

25 The party opposing summary judgment "may not rest upon the mere allegations or
26 denials of [the party's] pleading, but . . . must set forth specific facts showing that there is a
27 genuine issue for trial." Fed. R. Civ. P. 56(e); see Matsushita Elec. Indus. Co., Ltd. v. Zenith
28 Radio Corp., 475 U.S. 574, 586-87 (1986). There is no issue for trial unless there is

1 sufficient evidence favoring the non-moving party; "[i]f the evidence is merely colorable, or
2 is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at
3 249-50 (citations omitted). However, "[c]redibility determinations, the weighing of the
4 evidence, and the drawing of legitimate inferences from the facts are jury functions, not those
5 of a judge." Id. at 255. Therefore, "[t]he evidence of the non-movant is to be believed, and
6 all justifiable inferences are to be drawn in his favor" at the summary judgment stage. Id.

### III. CHOICE OF LAW

8 A federal court exercising supplemental jurisdiction over a state law claim is bound
9 to apply state law in the same manner it would were it sitting in diversity. United Mine
10 Workers v. Gibbs, 383 U.S. 715, 726 (1966). A federal court sitting in diversity applies the
11 forum state's choice of law rules. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496
12 (1941); Orr v. Bank of Am., 285 F.3d 764, 772 n.4 (9th Cir. 2002). Arizona courts apply the
13 rules set forth in the Restatement (Second) of Conflicts (1972) ("Restatement"). Bryant v.
14 Silverman, 703 P.2d 1190, 1191 (Ariz. 1985). Here, Plaintiff has non-federal claims against
15 Defendant Chavira for defamation and for intentional interference with Contract. As per the
16 former claim, section 149 of the Restatement states:

> In an action for defamation, the local law of the state where the publication occurs determines the rights and liabilities of the parties . . . unless, with respect to the particular issue, some other state has a more significant relationship . . . to the occurrence and the parties, in which event the local law of the other state will be applied.

20 As to Plaintiff's intentional interference with contract claim, section 145(a) of the
21 Restatement states:

> The rights an liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties . . . .

24 It is undisputed that Arizona is the site of publication of the allegedly defamatory statements.
25 Further, this case involves an employment relationship between Arizona citizens. All of the
26 alleged actions that form the basis for Plaintiff's claim took place in Arizona. Neither party
27 has argued that another forum's law would be more appropriate. Accordingly, Arizona law
28 shall be applied.

## IV. ANALYSIS

### A. Release of Claims

The separation agreement between Plaintiff and MedPro contains a clause entitled "Waiver, Release, and Discharge of Claims," that reads, in part:

> a. Except as set forth in paragraph 2(e) below, Dr. Carey waives, releases, and discharges all of his existing rights to any relief of any kind (known and unknown) from MedPro, and its insurers, affiliates, divisions, directors, officers, shareholders, members, employees, agents, attorneys, successors, and assigns (collectively the 'Released Parties'). Dr. Carey specifically acknowledges and agrees that Marcela Moffit is an employee of MedPro, and that as such, she is a Released Party, but only to the extent of her acts and/or omissions as an employee of MedPro which either would give rise to vicarious liability on the part of MedPro, or are claimed by Dr. Carey to give rise to vicarious liability on the part of Med Pro. . . .

Defendant Chavira argues that – as he was an employee of MedPro at the time of the alleged behavior that is the basis of this suit – any claims Plaintiff had against Chavira are released. Plaintiff, in turn, argues that because Chavira was not an employee of MedPro at the time the Settlement agreement was negotiated and executed, he is not covered under the Separation Agreement.

"A general principle of contract law is that when parties bind themselves by a lawful contract the terms of which are clear and unambiguous, a court must give effect to the contract as written." Grubb & Ellis Mgmt. Servs., Inc. v. 407417 B.C., L.L.C., 138 P.3d 1210, 1213 (citing Estes Co. v. Aztec Constr., Inc., 677 P.2d 939, 941 (Ariz. Ct. App. 1983)). The court may not "pervert or do violence to the language used or expand it beyond its plain and ordinary meaning or add something to the contract which the contracting parties did not put there." Bender v. Bender, 597 P.2d 993, 996 (Ariz. Ct. App. 1979) (citing Estrada v. Planet Insurance Company, 546 P.2d 372 (1976)). "It is not within the province or power of the court to alter, revise, modify, extend, rewrite or remake an agreement." Goodman v. Newzona Investment Co., Inc., 421 P.2d 318, 321 (Ariz. 1966). The existence of ambiguity in a contract is a matter of law. Cunha v. Ward Foods, Inc., 804 F.2d 1418, 1428 (9th Cir. 1986); see also Mercy Healthcare Ariz. v. Glen Curtis, Inc., No. CV-93-1358, 1995 U.S. Dist. Lexis 11476 at *15-16 (D. Ariz. 1995).

1 However, the contract between the parties here cannot be said to be unambiguous. 2 Whether the agreement is meant to cover people who were employees of MedPro at the time 3 the agreement was executed or people who were employees at the time of the actions at issue 4 in the lawsuit is entirely unclear. Nor does the fact that the release specifically names 5 Defendant Moffitt, as Defendant Chavira points to, settle this question; Moffit was an 6 employee at the time the release was written, and therefore unambiguously within its scope. 7 That Chavira was not included could imply that claims against him were released; it could 8 equally imply that he was never intended to be within its ambit.

9 Where, as here, the terms of a contract are ambiguous, "and it is necessary to turn to 10 extrinsic and conflicting evidence to determine the true meaning, the question should be 11 submitted to the jury, under proper instructions from the court." Miller Cattle Co. v. Francis, 12 298 P. 631, 633 (Ariz. 1931) (quoting Carrick v. Sturtevant, 234 P. 1080, 1082 (Ariz. 1925)). 13 In such a case, "oral testimony is admissible to show the meaning of the language in the 14 contract and the true intention of the parties."[1] Temp-Rite Eng'g Co. v. Chesin Constr. Co., 15 372 P.2d 701, 702 (Ariz. 1962). See also, Vaughey v. Thompson, 387 P.2d 1019, 1021-22 16 (Ariz. 1963). Plaintiff has testified to his intent at the time of formation. Carey SOF ¶ 259- 17 60. Neither party has provided evidence regarding MedPro's intent.

18 There is a genuine issue of material fact as to whether the release was intended to 19 cover Defendant Chavira.

20 B. Color of State Law

21 Count One of Plaintiff's Amended Complaint alleges that Chavira violated the First 22 Amendment to the United States Constitution as he "acting under color of law, subjected Dr. 23 Carey to adverse employment actions that resulted in the termination of the contract between 24 Dr. Carey and Medpro." Defendant Chavira argues that Plaintiff cannot succeed on his claim 25 because Chavira was not acting under color of state law.

---

27 [1] In such a case "it is certain that the purpose of the court is in all cases the ascertainment of the 'intention of the parties' if they had one in common." 1 A. Corbin, 28 Contracts § 106 (1963).

- 5 -

1    Private persons act "under color of law" when they are "jointly engaged with state
2  officials in the prohibited action." United States v. Price, 383 U.S. 787, 794 (1996). The
3  accused must be "a willful participant in joint activity with the State or its agents." Dennis
4  v. Sparks, 449 U.S. 24, 29 n. 4 (1980) (quoting Adickes v. S. H. Kress & Co., 398 U.S. 144,
5  152 (1970)). Individuals can be liable for such a conspiracy under section 1983 even if they
6  do "not know the exact details of the plan," however "each participant must at least share the
7  common objective of the conspiracy." United Steelworkers of America v. Phelps Dodge
8  Corp., 865 F.2d 1539, 1541 (9th Cir. 1989). "A defendant's knowledge of and participation
9  in a conspiracy may be inferred from circumstantial evidence and from evidence of the
10 defendant's actions." Gilbrook v. City of Westminster, 177 F.3d 839, 856-57 (9th Cir. 1999)
11 (citing United States v. Calabrese, 825 F.2d 1342, 1348 (9th Cir. 1987) (involving a criminal
12 conspiracy)).

13    Plaintiff supplies several pieces of evidence in support of such a conspiracy:

14    1) Defendant Moffitt states that she Defendant Chavira contacted Cathi Herrod,
15 executive director of the Arizona Center for Policy, regarding the Planned Parenthood
16 Affiliation Agreement. Moffitt states that she contacted Herrod because she was concerned
17 the agreement was illegal and "needed another set of eyes" on it. Moffit Dep, Carey SOF
18 Ex. 9.

19    2) Ronald Max Johnson of Arizona Right to Life testified in his deposition that either
20 Moffitt or Chavira (he does not recall precisely whom) described to him pressure on residents
21 to rotate to Planned Parenthood. Johnson Dep., Carey SOF Ex. 33.

22    3) Herrod states that Chavira and Moffitt "expressed to [her] that they believed that
23 the Planned Parenthood agreement violated county policy, violated state law because it was
24 facilitating . . . the training of residents in performing abortions using taxpayer dollars."
25 Herrod Dep., Carey SOF Ex. 31.

26    4) Plaintiff publicly and repeatedly objected to what he viewed as attempts by
27 Defendants to limit availability of abortions and training. See, e.g., Carey Dep., Carey SOF
28

- 6 -

Ex. 5, Ex. 10; Kearney Dep., Carey SOF Ex. 11; Ellert Dep., Carey SOF Ex. 57; Kunasek e-mail, Carey SOF Ex. 59.

5) Chavira attended a meeting in December, 2003 – to which Plaintiff was not invited. Also in attendance were Moffit, Stapley, Kunasek, John Jakubczyk of Arizona Right to Life, Ronald Johnson, Dr. James Mouer and Dr. William Farnsworth. It was held at the law offices of Herrod's husband. Moffit Dep., Carey SOF Ex. 9; Chvira Dep., Carey SOF Ex. 23; Kunasek Dep., Carey SOF Ex. 13. Moffit testified that the meeting involved "strategic planning for the department of OB/GYN," clarifying that "if there was a change in the leadership," it was "basically, planning for that change in leadership potentially." Moffit Dep., Carey SOF Ex. 9.

6) Soon after that meeting Plaintiff was asked if he would resign by MMC CEO Mark Hillard. Carey Aff. ¶ 46.

6) Kunasek testified that an allegation that Carey performed an abortion without the patient's informed consent was brought to his attention, and stated that it was likely that it was done so by either Moffitt or Chavira. Kunasek Dep., Carey SOF Ex. 13, Ex. 34. Moffitt stated that Chavira had reported a violation of the county's abortion policy to Kunasek. Moffit Dep., Carey SOF Ex. 16.

7) Chavira and Kunasek spoke on a number of occasions during the summer and fall of 2004 regarding abortion training and the Planned Parenthood agreement. Kunasek Dep., Carey SOF Ex. 34. Chavira did not inform Plaintiff of these conversations. Chavira Dep., Carey SOF Ex. 24.

8) After Chavira resigned from MedPro, he met with Tim Casey, counsel for County Defendants, and stated that he had received complaints relating to Plaintiff's wife's business solicitation of residents. Chavira Def., Carey SOF Ex. 24. They also discussed alleged sexually inappropriate comments made by Plaintiff. Id.

9) Chavira allegedly copied two patient charts – in violation of hospital confidentiality policy – to demonstrate that improper abortions were done. He gave these charts to Moffitt,

- 7 -

who stated that she "honestly felt like he was on a fishing expedition." Moffitt Dep., Carey SOF Ex. 16; Carey Dep., Carey SOF Ex. 10.

10) Meanwhile, Chavira was participating in anti-abortion prayer vigils outside the Planned Parenthood facility where PIROG residents rotated. On at least one occasion, he met Casey, counsel for the County Defendants, at such a vigil. Chavira Dep, Carey SOF Ex. 24.

Taken together, and particularly given the fact that Chavira attended a meeting in the midst of the other event at issue, with MedPro employees and pro-life activists to discuss a change in leadership at MedPro, there is a genuine issue of material fact such that a jury could infer Chavira's "knowledge of and participation in a conspiracy." Gilbrook, 177 F.3d at 857.

Defendant Chavira notes that Plaintiff did not name him as a state actor in his original notice of claim, filed pursuant to Arizona law. He does not, however, allege that this means the claim against Chavira is invalid, and that initial failing does not weigh probatively on the fact of Chavira's involvement. Nor is the fact that Chavira "was a junior faculty member Dr. Carey's subordinate" dispositive. Subordinates may take actions in furtherance of a conspiracy against their senior, particularly where more senior employees are also involved in the conspiracy, as is alleged here.

Defendant Chavira relies on Collins v. Womancare, in which the Ninth Circuit held that Defendants who made a citizens arrest against protestors were not acting under color of state law as:

> [t]he circumstances of this case simply do not establish that the state has so far insinuated itself into a position of interdependence with Womancare employees that it must be recognized as a joint participant in the challenged activity. . . . First, it is undisputed that the impetus for the arrests came from Womancare employees and not San Diego police officers. Indeed, the police officer attempted to *discourage* Womancare employees from making the arrests by warning them of the danger of civil liability for false arrest. Second, the police officer refused after conducting an independent investigation, to arrest the protestors on his own authority. Third, the Collins group has not disputed nor are there alleged any facts in opposition to Womancare's contention that the police maintained a policy of neutrality in the dispute.

1  878 F.2d 1145, 1155 (9th Cir. 1989) (internal citations and quotations omitted). He writes:
2  "Dr. Chavira's interaction with the state was far less than even the protestors in Collins,"
3  Defendant argues.

4  However, unlike the protestors in Collins, Chavira was a public employee who is
5  alleged to have actually conspired to remove Plaintiff from his position and to have taken
6  affirmative steps in furtherance of that conspiracy. Plaintiff has provided enough evidence
7  to create a genuine issue of material fact as to the validity of these allegations. Conversely,
8  in Collins, it was uncontested that the state actors in questions deliberately distanced
9  themselves from and discouraged the actions of the non-state actors.

10  Accordingly, given that a jury may infer the existence of a conspiracy from
11  circumstantial evidence, it cannot be concluded as a matter of law that Chavira did not act
12  under color of state law. Defendant's Motion for Summary Judgment fails on this point.

### C. Plaintiff's Defamation Claim

14  Arizona law specifies a one year statute of limitation for defamation actions. A.R.S.
15  § 12-541(1). "An action for defamation accrues and the Statute of Limitations begins to run
16  upon publication," i.e., when the statement was communicated to third person (someone
17  other than the one defamed). Lim v. Superior Court In and For Pima City, 616 P.2d 941, 942
18  (Ariz. Ct. App. 1980); 50 Am. Jur. 2d Libel and Slander § 220 (2008). None of the eleven
19  allegedly defamatory statements made by Chavira was made after November 30, 2003;
20  barring any tolling, then, the last day that Plaintiff could maintain an action for defamation
21  against Chavira was November 30, 2004. Plaintiff's action was filed August 18, 2005.

22  Plaintiff cites the "discovery rule" which holds that when defamatory statements are
23  "published in a manner in which [they were] peculiarly likely to be concealed from the
24  plaintiff," the cause of action accrues when the plaintiff discovers the statements or
25  reasonably should have discovered them. Wietecha v. Ameritas Life Ins. Corp., NO-CV-05-
26  0324, 2006 U.S. Dist. Lexis 70320 at * 14-15 (citing Clark v. AiResearch Co. of Arizona,
27  673 P.2d 984, 986-87 (Ariz. Ct. App. 1983)). Plaintiff argues that Chavira communicated
28  his defamatory statements to Kunasek, Moffitt and others in a "clandestine and insidious"

1 way, thus falling under the discovery rule. Accordingly, while Plaintiff "suspected that
2 Defendant Chavira may have defamed him (and sued based on those good-faith suspicions),
3 it was not until the commencement of discovery that may of his suspicions were confirmed."

4 However, Arizona cases have applied the discovery rule exceedingly sparingly.[2] In
5 Clark, the court cites Illinois and Texas cases involving defamatory reporting to a credit
6 agency, a Washington case involving confidential business memoranda, and a California case
7 in which a defamatory letter was placed in a school teacher's confidential personnel file. 673
8 P.2d at 986. In the case at hand, the Clark court found that the rule of discovery did not
9 extend to cases where remarks were not made in an "*inherently* secret or confidential matter."
10 Id. at 987 (emphasis added). Accordingly, because "Clark admitted in his deposition that
11 even before he resigned from AiResearch and continually in the years following, he was led
12 to believe that negative things were being said about him by personnel at AiResearch," the
13 rule of discovery did not apply. Id. at 987.

14 The facts here are indistinguishable from Clark. Chavira's alleged remarks were not
15 published in an *inherently* confidential matter. They may, indeed, have been clandestine, as
16 Plaintiff alleges, however remarks made among co-workers and their associates are simply
17 not the sort of defamation that comes under the scope of the discovery rule. That rule is
18 limited to things which are, by actual rule of confidentiality or privacy, inaccessible to the
19 wronged party.

20 Accordingly, Plaintiff's defamation claim is time barred.

### D. Interference with Contract

22 Plaintiff alleges Defendants – including Chavira – intentionally interfered with
23 Plaintiff's contractual relationship with MedPro, causing Plaintiff's employment to terminate.

---

[2] As Chavira points out, the discovery rule has been found to apply in only one case, a case decided under A.R.S. § 12-821.01 rather than A.R.S. 12.541, which authorizes claims against public entities and public employees and specifically states that "[f]or purposes of this section, a cause of action accrues when the damaged party realizes he or she has been damaged and knows or reasonably should know the case, source, act, event, instrumentality or condition which caused or contributed to the damage." A.R.S. § 12-821.01(B).

- 10 -

1  To prove the tort of intentional interference with contractual relations in Arizona, a Plaintiff

2  must show:

3  > the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship of expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted. . . . In addition, the interference must be improper as to motive or means before liability will attach.

6  Neonatology Assocs. v. Phoenix Perinatal Assocs., 164 P.3d 691, 693 (Ariz. Ct. App. 2007)

7  (quoting Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors, 909 P.2d

8  486, 494 (Ariz. Ct. App. 1995)). To be actionable, interference must "be both intentional and

9  improper . . . . If the interferer is to be held liable for committing a wrong, his liability must

10 be based on more than the act of interference alone. Thus, there is ordinarily no liability

11 absent a showing that defendant's actions were improper as to motive or means." Safeway

12 Ins. Co. v. Guerrero, 106 P.3d 1020, 1026 (2005).

13     Chavira argues first that the existence of a conditional privilege for his alleged

14 statements defeats this claim. This conditional privilege is "based on the social utility of

15 protecting statements required to be made in response to a legal, moral or social duty." Green

16 Acres Trust v. London, 688 P.2d 617, 624 (1984). However, Arizona courts have "rejected

17 the 'formalistic privilege concept in favor of a requirement that an interference be 'improper'

18 for liability to attach." Safeway Ins. Co. v. Guerrero, 106 P.3d 1020, 1025 (Ariz. 2005)

19 (quoting Wagenseller v. Scottsdale Mem'l Hosp., 710 P.2d 1025, 1043 (Ariz. 1985)).

20 Instead, the focus must be on whether the defendant "'acted improperly' and not on whether

21 the lawyers were 'privileged' to interfere in the contractual relationship between Safeway and

22 Botma." Id. Accordingly, Defendant's claim of privilege fails.[3]

---

[3] Chavira's Motion for Summary Judgment does, indeed, quote Arizona's jurisprudence on the topic of determining whether the interference is "improper." However, Plaintiff does not make an argument based on this standard, instead focusing entirely on its claim of conditional privilege and stating that "[b]ecause the conditional privilege is 'based on the social utility of protecting statements required to be made in response to a legal, moral or social duty,' . . . privileged statements cannot be improper." It will not, therefore, be considered on summary judgment.

- 11 -

1     Second, Chavira argues that Plaintiff cannot establish that Chavira caused him any harm. Chavira notes that the last allegedly tortious comment from Chavira was made in October, 2003. In May of 2004, Plaintiff was investigated by MedPro a second time and cleared of any wrongdoing alleged by Chavira's allegations. Later that year, Plaintiff's contract with MedPro was renewed. Plaintiff's voluntary severance commenced in March, 2005. Accordingly, Chavira states, "his resignation from MedPro has all the indicia of a voluntary severance from the company," and "there is no evidence that any allegedly tortious comments made by Dr. Chavira caused MedPro to end its relationship with Dr. Carey." Plaintiff responds that "Dr. Carey's final departure from MedPro was merely the *coup de grâce* in a long, drawn out, and far from voluntary termination."

    Further, Plaintiff points to governing law which states that

> [o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

Restatement (Second) of Torts § 766A (1979); Plattner v. State Farm Mut. Auto Ins. Co., 812 P.2d 1129, 1134 (Ariz. Ct. App. 1991). This section does not require that the alleged interfering act actually have the effect of terminating the contract in and of itself. Given the conspiracy Chavira is alleged to have participated in to remove Plaintiff, and given the evidence Plaintiff has provided in furtherance of that conspiracy (see section on "Color of Law," *supra*), Plaintiff has demonstrated that there is a genuine issue of material fact as to whether Chavira's actions constitute intentional interference with Plaintiff's contract.

    Accordingly,

    **IT IS ORDERED** Defendant's Motion shall be **GRANTED IN PART** and **DENIED IN PART**, consistent with the terms of this Order.

DATED this 10th day of March, 2009.

                                  Roslyn O. Silver
                                  United States District Judge