WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| J. Christopher Carey,            ) | No. cv-05-2500-PHX-ROS |
|                                  ) | |
| Plaintiff,         ) | **ORDER** |
|                                  ) | |
| vs.                              ) | |
|                                  ) | |
| Maricopa County, et al.,         ) | |
|                                  ) | |
| Defendant.         ) | |
|                                  ) | |

Pending before the Court is Defendants Dr. Maricela and Robert Moffitts' Motion for Summary Judgment (Doc. 328). For the reasons discussed herein, Defendants' Motion shall be granted in part and denied in part.

## BACKGROUND

Beginning in 2001, Plaintiff Dr. J. Christopher Carey, a physician, served as Chair of Obstetrics and Gynecology with Defendant Maricopa Medical Center ("MMC") (an entity within the Maricopa Integrated Health System ("MIHS")). He also served as Residency Program Director for the Phoenix Integrated Residency in Obstetrics and Gynecology ("PIROG"), a residency program at MMC. His employment was pursuant to an employment contract with MedPro, which in turn contracted with MMC.

The topic of abortion was a hotly contested one in Plaintiff's workplace during his tenure. As part of the residency program that Defendant supervised, PIROG required residents who did not have a moral objection to obtain training in performing abortions

1. through a rotation at Planned Parenthood. In the summer of 2003, Dr. William Chavira and
2. Dr. Marcela Moffitt, both employed by MedPro, contacted Cathi Herrod at the Center for
3. Arizona Policy, a group with an anti-abortion focus, to discuss their opposition to the
4. Planned Parenthood rotation. Plaintiff alleges that this event sparked a variety of actions
5. against Plaintiff by Chavira, Moffitt, and others, designed to undermine his position as
6. PIROG director and OB/GYN Chair, including pretextual investigations against him. On
7. September 22, 2004, the Maricopa County Board of Supervisors removed Plaintiff from his
8. leadership positions at MMC; soon after, he negotiated a formal severance agreement with
9. MedPro.
10. Plaintiff now brings suit against a number of persons and organizations associated
11. with the end of his employment with MedPro, including Defendant Moffitt. He alleges that
12. Moffitt acted under color of state law to violate his First Amendment rights, defamed him,
13. and intentionally interfered with his contract with MedPro.
14. Defendant Moffitt argues that each claim against her should be dismissed as a matter
15. of law.

### STANDARD OF REVIEW

17. A court must grant summary judgment if the pleadings and supporting documents,
18. viewed in the light most favorable to the non-moving party, "show that there is no genuine
19. issue as to any material fact and that the moving party is entitled to a judgment as a matter
20. of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
21. Substantive law determines which facts are material, and "[o]nly disputes over facts that
22. might affect the outcome of the suit under the governing law will properly preclude the entry
23. of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In
24. addition, the dispute must be genuine; that is, "the evidence is such that a reasonable jury
25. could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.
26. "[A] party seeking summary judgment always bears the initial responsibility of
27. informing the district court of the basis for its motion, and identifying those portions of the
28. pleadings, depositions, answers to interrogatories, and admissions on file, together with the

1  affidavits, if any, which it believes demonstrate the absence of a genuine issue of material
2  fact." Celotex, 477 U.S. at 323 (internal quotations and citations omitted). The party
3  opposing summary judgment "may not rest upon the mere allegations or denials of [the
4  party's] pleading, but . . . must set forth specific facts showing that there is a genuine issue
5  for trial." Fed. R. Civ. P. 56(e); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
6  475 U.S. 574, 586-87 (1986). There is no issue for trial unless there is sufficient evidence
7  favoring the non-moving party; "[i]f the evidence is merely colorable, or is not significantly
8  probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations
9  omitted). However, "[c]redibility determinations, the weighing of the evidence, and the
10 drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id.
11 at 255. Therefore, "[t]he evidence of the non-movant is to be believed, and all justifiable
12 inferences are to be drawn in his favor" at the summary judgment stage. Id.

## CHOICE OF LAW

14      A federal court exercising supplemental jurisdiction over a state law claim is bound
15 to apply state law in the same manner it would were it sitting in diversity. United Mine
16 Workers v. Gibbs, 383 U.S. 715, 726 (1966). A federal court sitting in diversity applies the
17 forum state's choice of law rules. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496
18 (1941); Orr v. Bank of Am., 285 F.3d 764, 772 n.4 (9th Cir. 2002). Arizona courts apply the
19 rules set forth in the Restatement (Second) of Conflicts (1972) ("Restatement"). Bryant v.
20 Silverman, 703 P.2d 1190, 1191 (Ariz. 1985). Here, Plaintiff has non-federal claims against
21 Defendant Chavira for defamation and for intentional interference with Contract. As per the
22 former claim, section 149 of the Restatement states:

> In an action for defamation, the local law of the state where the publication occurs determines the rights and liabilities of the parties . . . unless, with respect to the particular issue, some other state has a more significant relationship . . . to the occurrence and the parties, in which event the local law of the other state will be applied.

26 As to Plaintiff's intentional interference with contract claim, section 145(a) of the
27 Restatement states:

> The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties . . . .

It is undisputed that Arizona is the site of publication of the allegedly defamatory statements. Further, this case involves an employment relationship between Arizona citizens. All of the alleged actions that form the basis for Plaintiff's claim took place in Arizona. Neither party has argued that another forum's law would be more appropriate. Accordingly, Arizona law shall be applied.

### A. Plaintiff's First Amendment Claim

Defendant Moffitt argues that there is no admissible evidence in the record demonstrating that she acted under color of state law or to deprive Plaintiff of his constitutional right to free speech.

Individuals act "under color of law" when they are "jointly engaged with state officials in the prohibited action." United States v. Price, 383 U.S. 787, 794 (1996). The accused must be "a willful participant in joint activity with the State or its agents." Dennis v. Sparks, 449 U.S. 24, 29 n. 4 (1980) (quoting Adickes v. S. H. Kress & Co., 398 U.S. 144, 152 (1970)). Individuals can be liable for such a conspiracy under 42 U.S.C. § 1983 even if they do "not know the exact details of the plan," however "each participant must at least share the common objective of the conspiracy." United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1541 (9th Cir. 1989). "A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions." Gilbrook v. City of Westminster, 177 F.3d 839, 856-57 (9th Cir. 1999) (citing United States v. Calabrese, 825 F.2d 1342, 1348 (9th Cir. 1987) (involving a criminal conspiracy)). Circumstantial evidence in employment cases can  include: "(1) proximity in time between the protected speech and the alleged retaliation; (2) the employer's expressed opposition to the speech; and (3) other evidence that the reasons proffered by the employer for the adverse employment action were false and pretextual." Allen v. Iranon, 283 F.3d 1070, 1077 (9th Cir. 2002).

Plaintiff has, in fact, provided several pieces of evidence that might tend to indicate Moffit's participation in a conspiracy to take action against Plaintiff, including:

1) that both Moffitt and Plaintiff signed a May 2003 Program Information Form certifying that residents received access to training in induced abortion through a rotation with Planned Parenthood. PIROG PIF, Carey SOF Ex. 30. However, Moffitt then refused to sign the agreement that renewed the affiliation agreement with Planned Parenthood for "moral and religious reasons." Moffitt Dep., Carey SOF Ex. 33.

2) that Moffitt states that she contacted Cathi Herrod, executive director of the Arizona Center for Policy, regarding the Planned Parenthood Affiliation Agreement. Moffitt states that she contacted Herrod because she was concerned the agreement was illegal and "needed another set of eyes" on it. Moffit Dep, Carey SOF Ex. 9. The Center for Planned Parenthood's mission statement states that it "battle[s] organizations like Planned Parenthood . . . that seek to destroy traditional families and traditional moral values." CAP, "Our Mission," Carey SOF Ex. 32. The two spoke on the phone about the arrangement. Moffitt Dep., Carey SOF Ex. 9.

3) that after Moffitt and Herrod's phone call, Moffit sent Herrod a copy of the Planned Parenthood affiliation agreement. Moffit Dep., Carey SOF Ex.9 . Herrod then arranged to meet with a member of the Maricopa Board of Supervisors (and a defendant in this action) Andrew Kunasek, and gave him a copy of the Planned Parenthood agreement. Herrod Dep., Carey SOF Ex. 31.

4) that, meanwhile, Moffitt also contacted Kunasek, explaining to him that she had concerns about abortion training at Planned Parenthood. He testified that Moffitt and Defendant Chavira were his primary sources of information regarding activities at PIROG. Kunasek Dep., Carey SOF, Ex. 13.

5) that Kunasek testified that an allegation that Carey performed an abortion without the patient's informed consent was brought to his attention, and stated that it was likely that it was done so by either Moffitt or Chavira. Kunasek Dep., Carey SOF Ex. 13, Ex. 34.

1 Moffitt stated that Chavira had reported a violation of the county's abortion policy to
2 Kunasek. Moffit Dep., Carey SOF Ex. 16.

3     6) that Moffitt told Kunasek that Carey broke county abortion policy. Moffit Dep.,
4 Pl. Resp. to Moffitt, Ex. 5.

5     7) that Moffitt asked Carey at a MedPro board meeting and demanded to know if he
6 would resign. Carey Aff., ¶ 43.

7     8) that Moffitt attended a meeting in December, 2003 – to which Plaintiff was not
8 invited. Also in attendance were, among others, Chavira, Kunasek, John Jakubczyk of
9 Arizona Right to Life, Ronald Johnson, Dr. James Mouer and Dr. William Farnsworth. It
10 was held at the law offices of Herrod's husband. Moffit Dep., Carey SOF Ex. 9; Chvira
11 Dep., Carey SOF Ex. 23; Kunasek Dep., Carey SOF Ex. 13. Moffit testified that the
12 meeting involved "strategic planning for the department of OB/GYN," clarifying that "if
13 there was a change in the leadership," it was "basically, planning for that change in
14 leadership potentially." Moffit Dep., Carey SOF Ex. 9.

15     9) Soon after that meeting, MMC CEO Mark Hillard asked Plaintiff if he would
16 resign. Carey Aff. ¶ 46.

17     10) In February, 2004, Moffitt e-mailed Plaintiff regarding a potential conflict of
18 interest resulting from Plaintiff's inclusion of information from his wife, a realtor, in
19 information about Phoenix and local housing options distributed to residents. Carey SOF,
20 Ex. 70. Soon after, the Board of Supervisors authorized Tim Casey, now counsel for County
21 Defendants, to investigate "whether Dr. Carey's alleged statements and conduct may have
22 adverse affects [sic] on the delivery of healthcare services at Maricopa Medical Center."
23 Letter from Casey, Carey SOF Ex. 72. Casey described this investigation into a "potential
24 hostile work environment" as having "discovered information indicating that Dr. Carey may
25 have used his positions as OBGYN Department Chair and Residency Program Director to
26 obtain the County's contact information about physicians who apply to, or who have been
27 selected for, the County's OBGYN Residency Program and, in turn, provided the same to
28 his spouse for use and potential financial benefit." Id. A later investigation concluded in

1 much milder language that Plaintiff's "actions represented a lapse of good judgment, but not
2 a breach of medical ethics, or violation of any Medical Staff Bylaws or Rules of
3 Regulations." Def. Moffitt's Ex. 74. It recommended a letter of admonishment issue to
4 Plaintiff, but did not find any grounds for probation, supervision, or reductions of clinical
5 privileges. Id.

6       11) Moffitt then voted at the MMC Professional Practices Committee not to re-
7 credential Plaintiff. Moffit Dep., Carey SOF Ex. 16. She then motioned that he be removed
8 as chair and program director. PPC Minutes, Carey SOF Ex. 50.

9       Taken together, Plaintiff has provided sufficient, admissible, uncountered evidence
10 that Moffitt was conspiring with County Defendants to take adverse action against Plaintiff,
11 creating a genuine issue of material fact regarding "defendant's knowledge of and
12 participation in a conspiracy." Gilbrook, 177 F.3d at 857. This is particularly true given the
13 intercourse between Plaintiff, County Defendants, and local pro-life activists. The proximity
14 of the communications between these parties to the investigations against Plaintiff and his
15 removal from his leadership positions strengthens these inferences.

16       Moffitt cites to Collins v. Womencare, 878 F.2d 1145 (9th Cir. 1989), which found
17 that "merely complaining to the police does not convert a private party into a state actor."
18 Id. at 1155. However, in that case, the Ninth Circuit found that "[t]he circumstances . . .
19 simply do not establish that the state has so far insinuated itself into a position of
20 interdependence with Womancare employees that it must be recognized as a joint participant
21 in the challenged activity." Id. Here, on the other hand, Plaintiff has provided evidence
22 supporting a narrative in which Moffitt actively conspired with various private and public
23 actors to remove Plaintiff from his positions. Plaintiff has demonstrated a genuine issue of
24 material fact whether Moffit did more than merely complain to supervisors about what she
25 saw as a violation of policy. Similarly, while the Ninth Circuit has affirmed summary
26 judgment where "the record [did not] indicate that [the defendant] participated in or was
27 responsible for the decisions to extend [the plaintiff's probation or to terminate her], Thomas
28 v. City of Beaverton, 379 F.3d 802, 811 (9th Cir. 2004), Plaintiff has shown a genuine issue

of material fact as to whether Moffit, through her continued contacts with decisionmakers and others regarding Plaintiff constituted active involvement in the adverse actions against him.

Accordingly, Moffitt will not be granted summary judgment on the ground that she was not acting under color of state law.

### B. Tortious Interference with a Contractual Relationship

Moffitt argues that Plaintiff has presented no admissible evidence that Moffitt tortiously interfered with his MedPro contract. To prove the tort of intentional interference with contractual relations in Arizona, a Plaintiff must show:

> the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship of expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted. . . . In addition, the interference must be improper as to motive or means before liability will attach.

Neonatology Assocs. v. Phoenix Perinatal Assocs., 164 P.3d 691, 693 (Ariz. Ct. App. 2007) (quoting Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors, 909 P.2d 486, 494 (Ariz. Ct. App. 1995)). To be actionable, interference must "be both intentional and improper . . . . If the interferer is to be held liable for committing a wrong, his liability must be based on more than the act of interference alone. Thus, there is ordinarily no liability absent a showing that defendant's actions were improper as to motive or means." Safeway Ins. Co. v. Guerrero, 106 P.3d 1020, 1026 (Ariz. 2005).

Here, Moffitt argues Plaintiff has not provided admissible evidence that: (1) a third-party intentionally interfered with the contract; (2) Moffitt's conduct was either intentional or improper; or (3) the alleged interference induced or caused a termination of the MedPro contract. Moffitt also argues that Arizona courts have rejected tortious interference claims between co-employees.

Moffitt writes that "Arizona courts have repeatedly found that an employee acting in the course and scope of her duties cannot be a third-party for purposes of the tort of intentional interference." Defendant's analysis is at odds with state law, however. While

- 8 -

1  Arizona appellate courts have found that "when an individual superviser/defendant was
2  acting within the scope of authority as a management representative, he or she was, in effect,
3  the employer, and could not interfere with his or her own contract." Higgins v. Assmann
4  Elecs., Inc., 173 P.3d 453, 457 (Ariz. Ct. App. 2007).  However, this has never been
5  interpreted to mean that co-employees, generally, cannot be held liable for intentional
6  interference with a contract, even when the co-employee in question is a direct supervisor.
7  See, e.g., Wagenseller v. Scottsdale Memorial Hosp., 710 P.2d 1025 (Ariz. 1985).
8  Meanwhile, the Ninth Circuit, in a decision made under Arizona law, found the argument that
9  because a defendant "was a supervisor acting within the scope of his authority," the plaintiff
10 could not claim interference, to be "meritless," stating that it was specifically rejected in
11 Wagenseller. 710 P.2d at 1041-42.  Instead, the Wagenseller court emphasized whether the
12 interfering party's action was "improper." Bernstein v. Aetna Life & Cas., 843 F.2d 359, 367
13 (9th Cir. 1988).  Arizona courts have followed suit, considering not merely whether a
14 defendant is a co-employee but rather whether that co-employee's conduct was "improper."
15 See, e.g., Lindsey v. Dempsey, 735 P.2d 840, 843 (Ariz. Ct. App. 1987).

16       Accordingly, summary judgment cannot be granted if Plaintiff has demonstrated a
17 genuine issue of material fact as to whether (a) Moffitt intentionally interfered with
18 Plaintiff's contract with MedPro, (b) that interference was improper, and (c) that interference
19 caused a termination or breach of Plaintiff's contract.

20       i. Intentional Interference

21       "The question of intent ordinarily is for the finder of fact." Snow v. W. Sav. & Loan
22 Ass'n, 730 P.2d 204, 211 (Ariz. 1986).  As discussed above, Plaintiff has provided a great
23 deal of evidence that goes toward demonstrating a genuine issue of material fact that
24 Defendant intentionally interfered with his contract.  In particular, evidence of Defendant'
25 contacts with Cathi Herrod and Defendant Kunasek, and her attendance at the December,
26 2003 meeting support such a conclusion.  Moffitt's actions at the Professional Practices
27 Committee meeting do so as well.  A genuine issue of material fact exists on this point.

28       ii. Improper Interference

- 9 -

> In order to determine whether conduct is 'improper,' Arizona courts examine: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

Wagenseller, 710 P.2d at 387 (adopted from the Restatement (Second) of Torts § 766). This, too, is generally an issue for the trier of fact. Snow, 730 P.2d at 213. The first and third factors are considered the most important. Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund, 38 P.3d 12, 32 (Ariz. 2002). Courts have generally not examined these factors one by one in a mathematical manner, but rather have examined the plaintiff's allegations holistically. See, e.g., AGA S'holders, LLC v. CSK Auto, Inc., No. CV-07-0062, 2007 U.S. Dist. Lexis 59016 at *12-13 (D. Ariz. Aug. 10, 2007); Wells Fargo, 38 P.3d at 32.

Moffitt had repeated conversations about Plaintiff with Defendant Kunasek, Defendant Chavira and with third parties such as Cathi Herrod. Plaintiff argues that she attempted to oust Plaintiff in direct contravention of MedPro and MIHS practices and procedures. As evidence, he points to her statement that "in my lowly position, I did not feel I should be addressing the Board of Supervisors," Moffitt Dep., Pl. Resp. to Moffitt, Ex. 5, and that she did not direct her concerns regarding "the existence of, interpretation or application of any law to the Office Corporate Compliance" as required by MedPro's Corporate Compliance Program's Code of Conduct.[1] MedPro Code of Conduct, Pl. Resp. to Moffitt, Ex. 1. Instead, Moffitt discussed her concerns with Chavira and Herrod, an anti-abortion activist, and ultimately at a meeting including both Herrod and a representative from Arizona Right to Life.

This evidence is sufficient to raise a triable issue of fact as to the nature of Moffit's conduct and her motives, the latter in particular being an issue generally left to the jury.

---

[1] Moffitt apparently saw this Code of Conduct for the first time when she was being deposed in December, 2005. This does not, however, preclude a finding by the trier of fact that she acted in reckless disregard of established policy or made no effort to ascertain it.

- 10 -

1  Coronel v. Paul, 316 F. Supp. 2d 868, 882 (D. Ariz. 2004) (stating that "[w]here questions
2  regarding a litigant's state of mind, motive, sincerity or conscience are implicated, 'it is
3  unusual that disposition may be made by summary judgment.'"). Nor has Moffitt provided
4  countervailing evidence that negates this triable issue of fact, or shown that the other facts
5  outweigh those two, most important ones. Accordingly, there is a genuine issue of material
6  fact whether Moffitt's interference was improper.

7        iii. Interference Leading to Termination or Breach

8      Moffitt argues that Plaintiff cannot establish that Moffitt's actions actually interfered
9  with his contract. Given the close proximity of Moffitt's actions, described above, to the
10 adverse employment actions taken against Plaintiff, and given Moffitt's close contact with
11 those who took the adverse actions, Plaintiff has presented a genuine issue of material fact
12 that Moffitt's alleged interference led to the ultimate termination of Plaintiff's contract.

13     Moffitt does not dispute the evidence offered by Plaintiff, instead noting that Moffitt
14 did not have "the capability or authority to remove plaintiff from his positions of leadership
15 or to terminate his MedPro contract." This, however, has never been the standard for
16 intentional interference with contractual obligations; quite the opposite, in fact, as the third-
17 party requirement discussed above clearly shows.

18     Accordingly, Plaintiff's Motion for Summary Judgment on this count fails.

## C. Defamation

20     Moffitt argues that the defamatory statements alleged by Plaintiff are (a) outside the
21 statute of limitations period, (b) privileged, and (c) otherwise true or non-defamatory.

22       i. Statute of Limitations

23     Arizona law specifies a one year statute of limitation for defamation actions. A.R.S.
24 § 12-541(1). "An action for defamation accrues and the Statute of Limitations begins to run
25 upon publication," i.e., when the statement was communicated to third person (someone
26 other than the one defamed). Lim v. Super. Court In and For Pima Cty, 616 P.2d 941, 942
27 (Ariz. Ct. App. 1980); 50 Am. Jur. 2d Libel and Slander § 220 (2008). For this reason,
28

1 Moffitt contends that eight defamatory statements allegedly made by Moffitt from April,
2 2003 to September, 2003 are time-barred, as Plaintiff filed his complaint on August 18, 2005.

3 Plaintiff cites the "discovery rule" which holds that when defamatory statements are "published in a manner in which [they were] peculiarly likely to be concealed from the plaintiff," the cause of action accrues when the plaintiff discovers the statements or reasonably should have discovered them. Wietecha v. Ameritas Life Ins. Corp., No. CV-05-324, 2006 U.S. Dist. Lexis 70320 at * 14-15 (D. Ariz. Sep. 27, 2006) (citing Clark v. AiResearch Co. of Ariz., 673 P.2d 984, 986-87 (Ariz. Ct. App. 1983)). Plaintiff was told by the MedPro representatives who were assigned to investigate him of the allegations against him and that the person who made those allegations was confidential. Carey Aff., ¶ 34. Accordingly, Plaintiff argues, while Plaintiff suspected Moffitt had made the statements, he was not truly aware of that fact until the discovery phase of this litigation.

13 However, Arizona cases have applied the discovery rule exceedingly sparingly.[2] In Clark, the court cites Illinois and Texas cases involving defamatory reporting to a credit agency, a Washington case involving confidential business memoranda, and a California case in which a defamatory letter was placed in a school teacher's confidential personnel file. 673 P.2d at 986. The Clark court found that the rule of discovery did not extend to cases where remarks were not made in an "*inherently* secret or confidential matter." Id. at 987 (emphasis added). Accordingly, because "Clark admitted in his deposition that even before he resigned from AiResearch and continually in the years following, he was led to believe that negative things were being said about him by personnel at AiResearch," the rule of discovery did not apply. Id. at 987.

---

[2] The discovery rule has been found to apply in only one case, a case decided under A.R.S. § 12-821.01 rather than A.R.S. 12.541, which authorizes claims against public entities and public employees and specifically states that "[f]or purposes of this section, a cause of action accrues when the damaged party realizes he or she has been damaged and knows or reasonably should know the case, source, act, event, instrumentality or condition which caused or contributed to the damage." A.R.S. § 12-821.01(B).

- 12 -

This case presents the addition wrinkle that Plaintiff was told that the identity of the speaker was confidential. However, this is not sufficient to conclude that the statements were published in an inherently confidential manner. In fact, the publication itself was anything but confidential – Plaintiff was actually informed of the statements made against him. Anonymity is not the province of the discovery rule,[3] and Plaintiff has not demonstrated that any of the statements at issue were published in the inherently confidential manner Arizona law requires. Mere unlikelihood of discovery is not sufficient.

Any defamation claim based upon statements published before August 18, 2004 is thus time-barred.

ii. Privilege

A letter that Moffitt wrote to Dr. David Leach, executive director of the Accreditation Council for Graduate Medical Education ("ACGME") is not time-barred. Moffitt Ex. 99. Moffitt argues that it is, however, privileged as it was made under a legal obligation or social duty to one with a common interest.

The letter is framed as a response to Leach's letter of October 20, 2004, regarding a complaint alleging that MIHS was not in compliance with ACGME accreditation requirements. It notes that "MIHS reasonably believes that the allegations/complaint received by ACGME arise from a disagreement by some with the decision to remove" Plaintiff from his leadership positions and thus attempts to "provide ACGME with non-privileged background information on this subject so ACGME may place the allegations in a full and fair context." It then stated that

> [t]he MIHS governing body determined that the [MIHS Medical Staff Executive Committee]'s objective factual findings concerning Dr. Carey evidenced numerous and serious violations of the MIHS Medical Staff Bylaws and MIHS OB/GYN Department Rules and Regulations, and that such

---

[3] And, in fact, there is a long history of defamation suits brought against John Doe defendants, the identity of whom is ascertained by subpoena *after* the case is brought. See, e.g., Mobilisa v. Doe, 170 P.3d 712 (Ariz. Ct. App. 2007); Doe v. Cahill, 884 A.2d 451 (Del. 2005); Dendrite Int'l. Inc. v. Doe, 775 A.2d 756 (N.J. App. Div. 2001).

1  |  violations required Dr. Carey's removal from leadership positions in the best overall interests of MIHS and the OB/GYN residency program.

Similar allegations were repeated elsewhere in the letter.

> There is a two part test for determining whether a conditional privilege exists:
>
> First, the court must examine the circumstances to determine whether a privileged occasion arose. Second, once a conditional privilege applies, a plaintiff must prove the privilege was abused by proving actual malice or by demonstrating excessive publication. Abuse through 'actual malice' occurs when the defendant makes a statement knowing its falsity or actually entertaining doubts about its truth.

East v. Bullock's, Inc., 34 F. Supp. 2d 1176, 1183 (D. Ariz. 1998). In the case of the common interest conditional privilege, a common interest exists "where an occasion arises in which one is entitled to learn from his associates what is being done in a matter in which he has an interest in common with them." Green Acres Trust v. London, 688 P.2d 617, 625 (Ariz. 1984). One Arizona court has found that co-managers in a company "have a common interest in learning of an employee's termination." Id. Similarly, statements made in connection with reporting wrongdoing are privileged. See, e.g., Miller v. Servicemaster By Rees, 851 P.2d 143, 145 (Ariz. Ct. App. 1993) (finding that a conditional privilege exists "because public policy dictates that employees must be protected from workplace sexual harassment."). And some jurisdictions have recognized a privilege over statements made in connection with a workplace investigation. See, e.g., Scherer v. Rockwell Int'l Corp., 766 F.Supp. 593, 607 (N.D. Ill. 1991) (noting the existence of "a qualified privilege given to an employer investigating suspicious conduct by employees."). Courts in New York and Pennsylvania have found communications between a hospital and a medical entity and communications between an entity and its accrediting body, respectively, are published. Norwood v. City of New York, 203 A.D.2d 147, 149 (App. Div. 1st Dep't 1994); Qureshi v. St. Barnabas Hosp. Ctr., 430 F.Supp.2d 279, 291 (S.D.N.Y. 2006). Accrediting bodies relies on the programs they accredit to provide them with information about those programs that they may fulfill their (socially useful) purpose. Accordingly, it is appropriate to include that this is a situation in which a privileged occasion arose.

- 14 -

1  The question, then, is whether, as Plaintiff contends, it is inappropriate to grant
2  summary judgment on Moffitt's claim of privilege because the letter was written with actual
3  malice – i.e., that Defendant Moffitt wrote it "knowing its falsity or actually entertaining
4  doubts about its truth." Green Acres Trust, 688 P.2d at 624. To prevail at trial, Plaintiff must
5  demonstrate actual malice by "clear and convincing evidence." Selby v. Savard, 655 P.2d
6  342, 345 (Ariz. 1982). "The proof of 'actual malice' calls a defendant's state of mind into
7  question and does not readily lend itself to summary disposition." Hutchinson v. Proxmire,
8  443 U.S. 111, 120 n.9 (1979). Nor is the fact that a defendant has alleged "subjective belief
9  in the truth of the matter published" sufficient to escape liability. Selby, 655 P.2d at 345.
10 "[P]roof of the necessary state of mind could be in the form of objective circumstances from
11 which the ultimate fact could be inferred." Herbert v. Lando, 441 U.S. 153, 160 (1979).

12  Here, Plaintiff has presented sufficient evidence to establish a genuine issue of
13 material fact as to whether Moffitt knew of or entertained doubts about the falsity of the
14 statements in question. For instance, Plaintiff notes that while the letter states that the MIHS
15 governing body determined that the Medical Staff Executive Committee's made "objective
16 factual findings concerning" Plaintiff that "evidenced numerous and serious violations of the
17 MIHS Medical Staff Bylaws," the report itself states that Plaintiff's actions did not constitute
18 a "breach of medical ethics, or violation of any Medical Staff Bylaws or Rules or
19 Regulations," a fact of which Moffitt was aware. While this does not necessarily rule out the
20 possibility that the governing body determined that the report evidenced such, it, combined
21 with the evidence that some members of the board were personally motivated, discussed
22 above, does create a genuine issue of material fact as to that point.

23  iii. Truth or Falsity

24  Finally, Moffitt contends that any actionable statements in the PIROG response were,
25 in fact, true. As presented in the previous section, Plaintiff has provided sufficient evidence
26 raising a genuine material fact whether those statements were true.

### D. Release of Claims

- 15 -

Moffitt next claims that Plaintiff's tortious interference and defamation claims are barred by the Separation Agreement he entered into with MedPro which states: "Dr. Carey specifically acknowledges and agrees that Maricela Moffitt is an employee of MedPro, and that as such, she is a released party, but only to the extent of her acts and/or omissions as an employee of MedPro, which either would give rise to vicarious liability on the part of MedPro, or are claimed by Dr. Carey to give rise to vicarious liability on the part of MedPro." Separation Agreement, Moffit Ex. 29. Moffitt argues that Plaintiff's tortious interference and defamation claims are grounded on actions within the scope of her employment. Plaintiff argues that Moffitt was not acting within the scope of her employment and therefore that her actions would not give rise to vicarious liability on the part of MedPro.

Arizona courts look at several factors, adopted from the Restatement (Second) of Agency § 229 (1957). These factors are:

> (a) whether the act is one commonly done by such servants; (b) the time, place, and purpose of the act; (c) the previous relations between the master and servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent or departure from the normal method of accomplishing an authorized result; and (j) whether the act is seriously criminal.

Higgins, 173 P.3d at 461 (Ariz. Ct. App. 2007) (citing State v. Schallock, 941 P.2d 1275, 1280-86 (Ariz. Ct. App. 1997)). The Schallock court did not limit its analysis to the Restatement factors. It noted also that the improper conduct of the employer in question took place at or near the employer's office and that the employer was aware that its employee "was engaged in egregious improprieties and did little or nothing to call a halt." Id. at 1282. Ultimately, it found a jury "might well choose not to believe claims that these acts were unauthorized and outside the course of employment." Id.

Given that Moffitt continually went outside of the chain of command at MedPro in contacting third parties (e.g., Cathi Herrod) about Plaintiff, acting in direct contravention of

1  the MedPro policies described *supra*, Plaintiff has raised a genuine issue of material fact
2  regarding whether Moffitt was acting within the scope of her employment.

### E. Punitive Damages

In order to prove that he is entitled to punitive damages on his state law tort claims, Plaintiff must prove by "clear and convincing evidence" that Moffitt had an "evil mind" and demonstrated "aggravated and outrageous conduct." Linthicium v. Nationwide Life Ins. Co., 723 P.2d 675, 680 (Ariz. 1986). Plaintiff may meet this burden through "indirect and circumstantial evidence;" courts recognize that direct evidence (i.e., a statement from the defendant) of an "evil mind" is rare. Thompson v. Better-Bilt Aluminum Prods. Co., 832 P.2d 203, 210 (Ariz. 1992).

Here, Plaintiff has provided much evidence tending to support Moffit's involvement in a conspiracy to oust Plaintiff from his position due to his pro-choice beliefs. A jury could conclude that there is clear and convincing evidence that this was done with an evil mind.

Accordingly,

**IT IS ORDERED** Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**, as specified in this Order.

DATED this 10th day of March, 2009.

_____
Roslyn O. Silver
United States District Judge