WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| J. Christopher Carey,<br><br>      Plaintiff,<br><br>vs.<br><br>Maricopa County, et al.,<br><br>      Defendants. | No. cv-05-2500-PHX-ROS<br><br>**ORDER** |

Pending before the Court is County Defendants' Motion for Summary Judgment (Doc. 326). For the reasons stated herein, Defendants' Motion shall be granted in part and denied in part.

## BACKGROUND

Beginning in 2001, Plaintiff Dr. J. Christopher Carey, a physician, served as Chair of Obstetrics and Gynecology with Defendant Maricopa Medical Center ("MMC") (an entity within the Maricopa Integrated Health System ("MIHS")). He also served as Residency Program Director for the Phoenix Integrated Residency in Obstetrics and Gynecology ("PIROG"), a residency program at MMC. His employment was pursuant to an employment contract with MedPro, which in turn contracted to provide staffing and management for MMC.

As part of the residency program that Defendant supervised, PIROG allowed residents who were not opposed to obtain training in performing abortions through a rotation at

1  Planned Parenthood. This program was controversial and Plaintiff alleges that Defendants
2  undertook a series of actions to prevent PIROG from making abortion training available to
3  residents, including an effort to transfer the accreditation sponsorship of PIROG from MMC
4  to St. Joseph's Hospital.

5  Plaintiff is pro-choice, a position he states is informed by his religious affiliation as
6  a Methodist. He alleges that Defendants took a series of actions to remove Plaintiff from his
7  leadership positions. Among other things, they undertook a series of investigations against
8  Plaintiff on the basis of accusations that he performed illegal abortions, sexually harassed
9  residents, and that his wife improperly solicited business from residents for her real estate
10 agency. This last ground – the only one found by the investigators to have a basis in fact –
11 and Defendants' contention that Plaintiff allowed an unauthorized rotation with Planned
12 Parenthood were ultimately used by the County Board of Supervisors as cause (or pretense)
13 to remove Plaintiff from his leadership positions.

14 Plaintiff now brings suit against County Defendants, and others, alleging (1) violations
15 of Plaintiff's rights under the First and Fourteenth Amendments to the U.S. Constitution, (2)
16 unlawful discrimination against Plaintiff on the basis of his religious and moral views under
17 state and federal law, (3) defamation, and (4) intentional interference with Plaintiff's
18 contractual obligations to MedPro.

19                          STANDARD OF REVIEW
20 A court must grant summary judgment if the pleadings and supporting documents,
21 viewed in the light most favorable to the non-moving party, "show that there is no genuine
22 issue as to any material fact and that the moving party is entitled to a judgment as a matter
23 of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
24 Substantive law determines which facts are material, and "[o]nly disputes over facts that
25 might affect the outcome of the suit under the governing law will properly preclude the entry
26 of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In
27 addition, the dispute must be genuine; that is, "the evidence is such that a reasonable jury
28 could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

1  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (internal quotations and citations omitted). The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party; "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. at 255. Therefore, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. Id.

### III. CHOICE OF LAW

A federal court exercising supplemental jurisdiction over a state law claim is bound to apply state law in the same manner it would were it sitting in diversity. United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966). A federal court sitting in diversity applies the forum state's choice of law rules. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Orr v. Bank of Am., 285 F.3d 764, 772 n.4 (9th Cir. 2002). Arizona courts apply the rules set forth in the Restatement (Second) of Conflicts (1972) ("Restatement"). Bryant v. Silverman, 703 P.2d 1190, 1191 (Ariz. 1985). Here, Defendant contests Plaintiff's state law defamation claim against Defendant Kunasek. Section 149 of the Restatement states:

> In an action for defamation, the local law of the state where the publication occurs determines the rights and liabilities of the parties . . . unless, with respect to the particular issue, some other state has a more significant relationship . . . to the occurrence and the parties, in which event the local law of the other state will be applied.

It is undisputed that Arizona is the site of publication of the allegedly defamatory statements. Further, this case involves an employment relationship between Arizona citizens. All of the alleged actions that form the basis for Plaintiff's claim took place in Arizona. Neither party has argued that another forum's law would be more appropriate. Accordingly, Arizona law shall be applied.

## ANALYSIS

### A. Subject Matter Jurisdiction

County Defendants argue this Court lacks subject matter jurisdiction over Plaintiff's lawsuit on the ground that Plaintiff himself admitted that he was not removed for religious reasons when he stated "I believe that I was removed because I insisted that the institution [MIHS] follow ACGME policies, particularly Program Requirement V.C.4-5 [regarding abortion training" (Plaintiff made a number of other statements to that effect). This, County Defendants argue, means "this case is about a dispute over compliance with private accreditation standards, and not constitutionally protected speech or conduct."

Assuming, *arguendo*, that this interpretation is correct, County Defendants have still not demonstrated a lack of subject matter jurisdiction. Counts One, Two, Five and Seven are arguably premised on the constitutionally protected speech or conduct disputed by County Defendants. Counts Three, Four, and Six are state law claims. However, Count 8 alleges a deprivation of liberty interest in violation of the Fourteenth Amendment and argues that false, inaccurate, and stigmatizing statements were made against Plaintiff and given as the reason for his termination. This Count is not premised on the disputed First Amendment claim and County Defendants make no argument that Summary Judgment should be granted on it.

One federal claim is sufficient to support federal court jurisdiction over a case involving both federal and state law claims. 28 U.S.C. § 1367. Accordingly, County Defendants' argument that Subject Matter Jurisdiction is lacking cannot succeed.

### B. Plaintiff's Federal Claims

- 4 -

1   County Defendants argue for summary judgment on Plaintiff's First Amendment
2  claim – Count One – and unlawful discrimination claims under federal law – Counts Two,
3  Five, and Seven. Defendants' Motion does not segregate out Plaintiff's various claims in a
4  coherent manner. However, their arguments fail to meet the standard for summary judgment
5  on each point; therefore, this Court does not need to analyze the manner in which they might
6  apply to particular claims. Each of Plaintiff's federal claims against County Defendants will
7  survive summary judgment. A point-by-point analysis of Defendants' arguments follows.
8       i. Free Speech
9   In order to state a First Amendment claim against a public employer, an employee
10 must show: "1) the employee engaged in constitutionally protected speech; 2) the employer
11 took 'adverse employment action' against the employee; and 3) the employee's speech was
12 a 'substantial or motivating' factor for the adverse action." Marable v. Nitchman, 511 F.3d
13 924, 929 (9th Cir. 2007).
14       a. Constitutionally Protected Speech
15   Plaintiff must first show that his speech was federally protected, a question of law
16 rather than of fact. Connick v. Myers, 461 U.S. 138, 148 n. 7 (1983). In order to be federally
17 protected, the speech in question must (1) address "a matter of public concern, and (2) be
18 "made *as a citizen.*" Freitag v. Ayers, 463 F.3d 838, 853 (9th Cir. 2006).
19   At the outset, it is worth addressing Defendants' interpretation of the statements
20 referenced above, in which Plaintiff stated that he was removed after a dispute over
21 accreditation procedures. They write "compliance with a third party's private accreditation
22 standard, even one dealing with abortion, is not a protected activity under federal law."
23 County Defendants' interpretation of Plaintiff's statements as indicating that he was speaking
24 only of accreditation standards is strained past the breaking point. Plaintiff has provided a
25 great deal of evidence that he made plain and public his views *on abortion*, rather than
26 simply his views on what was required to meet the state standards. The statements pointed
27 to by County Defendants might have elided other reasons for his dismissal, been made in an
28 off-the-cuff manner without full thought given to their legal implications, been made in an

- 5 -

1 uninformed state. Whatever the case, they are not sufficient to negate the ample evidence that Plaintiff proffered public opposition to attempts to limit abortion training in the basis on his pro-choice beliefs. He provides several pieces of evidence in support of this:

1) Plaintiff has testified that he believes he was removed due to his opposition to efforts to restrict abortion training and that the basis of his actions were his "religious beliefs and political beliefs, that were in contradiction to the beliefs of members of the Board of Supervisors as well as others." Carey Dep., Carey SOF Ex. 5.

2) Plaintiff has testified that he objected to actions by County Defendants to limit abortion training multiple times at the Graduate Medical Education Committee and Program Directors meetings. In particular, he testified against actions of Dr. Moffitt to limit abortion training, including presenting "residents in the program in August of 2003 a contract amendment and told them they had to sign it, that contained a clause saying they would not perform abortions except to save the life of the mother." Carey Dep., Carey SOF Ex. 10.

3) Paul Kearney states that "Dr. Chavira was prolife and Dr. Carey was proabortion. their views in public at a staff meeting – at more than one staff meeting on that topic. And it was just a big disagreement that they had." Kearney Dep., Carey SOF Ex. 11.

4) Plaintiff sent literature explaining his position on abortion to members of the Board of Supervisors, contributing to one Board Member's opinion that he wasn't "that good of a team player." Wilson Dep., Carey SOF Ex. 55. This literature included a section entitled "Is abortion murder? What does the Scripture tell us? An obstetrician's perspective?" This material was authored by Plaintiff and includes a section on references to abortion in the Bible, as well as notes on Biblical interpretation. Letter to Don Stapley, Carey SOF Ex. 58.[1]

There is no question that Plaintiff's statements on abortion were a matter of public concern. "When speech addresses 'issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their

---

[1] Incidentally, this directly contradicts Defendants' unsupported assertion that the Board did not know of Plaintiff's religious beliefs.

- 6 -

1 government,' it 'falls squarely within the boundaries of public concern.'" Ulrich v. City &
2 County of San Francisco, 308 F.3d 968, 978 (9th Cir. 2002) (quoting Weeks v. Bayer, 246
3 F.3d 1231, 1234 (9th Cir. 2001).  Courts have found that this includes, for instance speech
4 about:  allocation of school funds, Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968); the
5 failure to grant pay raises to police officers, McKinley v. City of Eloy, 705 F.2d 1110, 1114
6 (9th Cir. 1983); budget cuts to the fire department, Gilbrook v. City of Westminster, 177 F.3d
7 839, 870 (9th Cir. 1999), and; standards of patient care at a public hospital.  Roth v.
8 Veteran's Admin., 856 F.2d 1401, 1406 (9th Cir. 1988).  The behavior of a public agency
9 and its employees – through MedPro – in training doctors to perform abortion is a matter that
10 touches on the adequacy of public medical training and treatment, a matter of core public
11 concern.  It is certainly not "of *no* relevance to the public's evaluation of the performance of
12 governmental agencies," information that "if released to the public, would convey no
13 information at all other than the fact that a single employee is upset with the status quo."
14 Pool v. VanRheen, 297 F3d 889, 907 (9th Cir. 2002); Connick v. Myers, 461 U.S. 138, 148
15 (1983).

16 Nor was Plaintiff's speech made solely in the course of his duties as a public
17 employee.  Statements are not part of an employee's official duties "merely because they
18 concerned the subject matter of her employment."  Marable v. Nitchman, 511 F.3d 924, 932
19 (9th Cir. 2007).  Nor is the fact that an employee "expressed his views inside his office,
20 rather than publicly . . . dispositive."  Garcetti v. Ceballos, 547 U.S. 410, 420 (2005).  One
21 employee's complaints about his "allegedly corrupt overpayment schemes" were found to
22 be "not in any way a part of his official job duties," as "his job was to do the tasks of a Chief
23 Engineer on his ferry, and such tasks did not include pointing to corrupt actions of higher
24 level officials."  Marable, 511 F.3d at 932.  Conversely, where a plaintiff correctional officer
25 complained that the prison administration's actions were causing her "authority and
26 discretion [to be] undermined," i.e., that her job performance was being affected, she was
27 acting pursuant to her official duties.  Freitag v. Ayers, 468 F.3d 528, 544 (9th Cir. 2006).
28

1    Had Plaintiff, then, limited himself to discussion of the program's accreditation, as
2 Defendants allege he did, his actions may indeed have fallen under his official duties to
3 supervise and direct that program.  However, there is ample evidence that his actions went
4 further than that.  Most notable is his dissemination of material to the Board of Supervisors
5 providing his pro-choice religious perspective on abortion, most assuredly not part of
6 Plaintiff's official duties in keeping the program functioning and accredited.

7    b. Adverse Employment Action

8    Plaintiff then must show that his employer took adverse employment action against
9 him.  County Defendants do not contest that such action was taken.  In addition to
10 investigations of wrongdoing against him – investigations that *may* have been improperly
11 motivated – and what may have amounted to constructive discharge in his departure from
12 MedPro, Plaintiff was stripped of his leadership positions.

13    c. Retaliatory Motive

14    Plaintiff must show his protected speech was a substantial motivating factor against
15 Defendants' decision to take adverse employment action against him.  This burden "may be
16 met with either direct or circumstantial evidence and involves questions of fact that normally
17 should be left for trial."  Ulrich, 308 F.3d at 979 (internal citations omitted).  Evidence, for
18 instance, of "proximity in time between the protected speech and the alleged retaliation" is
19 strong circumstantial evidence of retaliatory motive," as is "the employer's expressed
20 opposition to the speech."  Allen v. Iranon, 283 F.3d 1070, 1077 (9th Cir. 2002).

21    Plaintiff has provided sufficient circumstantial and direct evidence to create a genuine
22 issue of material fact that Defendants' were motivated by his protected speech.  Dr. Marco
23 Canulla, then interim CEO for MedPro, was asked by the Board of Supervisors, to terminate
24 Plaintiff's employment in Summer, 2003, apparently shortly after Plaintiff's communication
25 to the Board of Supervisors about his position on abortion.  Canulla Dep, Carey SOF Ex. 22.
26 Canulla responded that they "had really no grounds to terminate him."  Id.  Similarly,
27 Defendant Wilson stated Plaintiff was not a "team player" after receiving this same
28 communication.  Wilson Dep., Carey SOF Ex. 55.  Plaintiff also notes that there was little

1 time between his statements in opposition to Defendants' efforts to prohibit residents from
2 performing abortions and the investigations of misconduct initiated at the County's behest.
3  Carey Dep., Carey SOF Ex. 5; Balducci Dep., Carey SOF, Ex. 61.

4 Conversely, County Defendants have pointed to very little evidence that actions
5 against Plaintiff were not retaliatory, noting only that one of the investigations against
6 Plaintiff had found that, in allowing his wife to solicit business from resident physicians, he
7 had "had a lapse of good judgment" and that a letter of admonition was warranted.

8 Plaintiff has met his burden in demonstrating a genuine issue of material fact as to
9 whether the Board's actions were retaliatory.

10 ii. Plaintiff's Employment Status

11 Defendants argue that summary judgment must be granted because Plaintiff was "not
12 an employee of Maricopa County; he was employed by" third party MedPro. Accordingly,
13 they argue, "County Defendants could not have taken an adverse employment action against
14 him."

15 The law does not stand with County Defendants on this point. The Supreme Court
16 has found, for instance, that independent contractors are entitled to the same First
17 Amendment freedoms as employees, writing that "[d]etermining constitutional claims on the
18 basis of such formal distinctions, which can be manipulated largely at the will of the
19 government agencies concerned . . . is an enterprise that we have consistently eschewed."
20 Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 679 (1996). To allow the county's
21 delegation of hiring and staffing functions to a contractor to shield it from protecting the
22 rights of its employees would reinforce formal, easily manipulable distinctions at the expense
23 of protections to people who are, in every meaningful sense, public employees. Nor is there
24 a scintilla of law in support of such an interpretation.

25 Accordingly, Defendants' Motion fails on this point.

26 iii. Unlawful Discrimination

27 Defendants argue that Plaintiff cannot prevail on his unlawful discrimination claim
28 because there is no evidence that the Board was aware of his religious views or that they took

- 9 -

action against him because of it. However, Defendant fails to meet his burden of production on this point. First, as noted above, there has been evidence proffered – and left unrefuted – that the Board was well aware of Plaintiff's religious views. Second, in order to establish a *prima facie* case of employment discrimination under Title VII, a plaintiff must show that:

> (1) he is a member of a protected class;
> (2) he was qualified for his position;
> (3) he experienced adverse employment action; and
> (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.

Fonesca v. Sysco Food Servs. of Ariz., Inc., 374 F.3d 840, 847 (9th Cir. 2004).

The first three points are undisputed; Defendant has made no argument regarding Plaintiff's membership in a protected class, his qualifications, or that he experienced adverse employment action. Nor, however, has Defendant made any argument beyond conclusory statements that circumstances give rise to an inference of discrimination. Plaintiff, however, has provided evidence that has thus far gone unrefuted that Defendants did not consider him a "team player" due to his religious views, may have initiated ungrounded investigations against him, and removed him from his leadership positions on the basis of his religious and moral views rather than his personal qualifications.

Plaintiff, therefore, has met his burden on this claim.

iv. Due Process

Defendants include Count Seven in its list of "unlawful discrimination claims" that they claim cannot survive summary judgment. However, that Count alleges a denial of Plaintiff's procedural due process rights, a point that goes entirely unaddressed by Defendants. Defendants have thus not met their burden of production on this point.

## C. Defamation

Plaintiff's fourth count alleges that Defendant Kunasek made false and defamatory statements about Plaintiff and falsely accused him of breaches of ethics and of the Medical Staff bylaws. County Defendants state that a letter Kunasek wrote to William Eller, President of the MIHS Medical Staff and Professional Practice Committee. Plaintiff disputes

- 10 -

this, noting that Carey cited, when deposed by Plaintiffs, comments by Defendant Kunasek at Board of Supervisor meetings, an interview with Shane Wickfers published on the Arizona right to Life web page, and in newsletters from Life News and the New Mexico Right to Life. He also testified that Kunasek called him a "murderer" and referred to him as "Darth Vader." Carey Dep, Plaintiff Response to County, Ex. 1. Further, he testified that Kunasek stated that Plaintiff "should not be allowed to speak because [he] would not tell the truth." Carey Dep, Plaintiff Response to County, Ex. 10. Because they go unaddressed by Defendants, summary judgment cannot succeed as to any of these allegations.

As for the letter written by Defendant Kunasek, it argued that Plaintiff's staff privileges should not be renewed. In particular, Plaintiff objects to portions of the letter making statements regarding Plaintiff's wife's alleged solicitation of the residents for her real estate services, that Plaintiff may have made misleading or false statements regarding accreditation requirements, that Plaintiff's actions may have had an adverse effect on health care standards, and that Plaintiff established an unauthorized rotation with Planned Parenthood, exposing the hospital to liability.

County Defendants argue that this letter is absolutely privileged under Arizona's Peer Review statute, that it is absolutely privileged under Arizona law, conditionally privileged, and that it does not constitute defamation because it is made up of truthful statements and opinions. Because this Court finds that it is privileged under Arizona's Peer Review statute, it does not need to consider Defendants' other arguments.

County Defendants argue that the letter is a privileged communication pursuant to Arizona's Peer Review Statute, which states:

> Any individual who, in connection with duties or functions of a hospital or outpatient surgical center pursuant to section 36-445,[2] makes a decision or recommendation as a member, agent or employee of the medical or

---

[2] This section provides that licensed hospitals shall organize committees or other organizational structures "to review the professional practices within the hospital or center for the purposes of reducing morbidity and mortality and for the improvement of the car of patients provided in the institution."

- 11 -

>administrative staff of a hospital or center or of one of its review committees or related organizations or who furnishes any records, information, or assistance to such medical staff or review committee or related organization is not subject to liability for civil damages or legal action in consequence thereof.

A.R.S. § 36-445.02.

Defendants argue that the process of Plaintiff's re-appointment process was pursuant to the Peer Review statute. Accordingly, they argue, Kunasek is not subject to any liability for civil damages for anything said therein.

Plaintiff responds that immunity is limited only to "review of medical practices" taken for "purposes of reducing morbidity and mortality and for the improvement of the care of patients provided in the institution," and consists of review of "the nature, quality and necessity of the care provided and the preventability of complications and deaths occurring in the hospital or center." A.R.S. 36-445.

However, judicial interpretations of the immunity provisions do not support such a crabbed interpretation of relevancy. One Arizona court notes that immunity was granted in order to "encourage full and frank discussions and decision-making in a process that can be both time consuming and contentious." Hourani v. Benson Hosp., 122 P.3d 6, 9 (Ariz. Ct. App. 2005) (internal citations and quotations omitted.) The allegations made by Kunasek that Plaintiff compromised patient care standards, interfered with the smooth functioning of the residency program, and exposed the hospital to liability all bear, ultimately, on the care provided to patients.

Plaintiff also argues that Kunasek's letter arose outside the peer review process as it was "written from an individual member of the [Board of Supervisors] to someone other than the head of the [Professional Practices Committee]." Arizona courts have held that the privilege "protects the peer review process itself – the discussions, exchanges and opinions found in the committee minutes," and the "internal workings and deliberative processes of regularly constituted committees . . . ." Humana Hosp. Desert Valley v. Superior Court, 742 P.2d 1382, 1387, 1389 (Ariz. Ct. App. 1987). However, the prohibition does not apply when "there is a contention that the hospital failed to conform to procedural requirements set forth

- 12 -

in a hospital's constitution, bylaws, or rules and regulations." Hourani, 122 P.3d at 432 (quoting Peterson v. Tucson Gen Hosp., Inc., 559 P.2d 186, 189 (Ariz. Ct. App. 1976)).

The MIHS bylaws specify that the Professional Practices Committee shall "consider all relevant information available to it" then "formulate its recommendation to the Governing Body," which "shall adopt, reject, or modify a favorable recommendation of the Professional Practices Committee." MIHS Bylaws, § 5.7.7-5.7.8, County Defendants' Ex. 16. They also state, in a provision entitled "Initial Rapid Inquiry," that:

> Whenever information suggests that corrective action may be warranted, the Medical Staff President, or his/her designee, may, on behalf of the Medical Staff Executive Committee immediately investigate and conduct whatever interviews may be indicated.

Id,§ 11.2.

Kunasek's letter appears to have been sent in his individual capacity rather than as a member of the Board of Supervisors; the Board as a whole did not vote on it or sanction it. Wilson Dep., Carey Res., Ex. 12. It was sent to Dr. Ellert, who was head of the medical staff and not the Professional Practices committee. Lippman Dep, Carey Res., Ex. 13. Further, the Medical Executive Committee concluded that "it could not act upon Mr. Kunasek's letter" under Section 5.7.8(a) of the Bylaws "because the Bylaws provide that the remand only goes back to the Professional Practice Committee of the Governing Body." Report of Jaya Raj; County Defs., Ex. 14. Instead, "[t]he committee elected to proceed under Section 11.2 of the Medical staff Bylaws." Id. The Report stated that it was made pursuant to the Arizona Peer Review statute.

The question, then, is whether this letter was, in fact, part of the peer review process. Plaintiff argues that it is not as "under the MIHS Bylaws, only the 'Governing Body' is authorized to refer recommendations back to the PPC." This is, indeed, the case as far as Section 5.7.8(a) is concerned. However, the Bylaws also provide for an initial rapid inquiry in response to the vaguely defined "information," and it was under this provision that the Medical Staff Executive Committee took action on Kunasek's letter. The Arizona Peer Review statute states simply that hospitals shall "require that physicians . . . organize into

- 13 -

1 committees or other organizational structures to review the professional practices within the
2 hospital or center." A.R.S. § 36-445. Similarly, the immunity provision itself seems to cast
3 a broad scope, covering "recommendations" made "as a member, agent or employee of the
4 medical or administrative staff of a hospital or center," as well as anyone "who furnishes any
5 records, information, or assistance to such medical staff or review committee or related
6 organization."

7 Kunasek's letter furnished information to the Medical Staff Executive Committee
8 which was acted on by them pursuant to hospital bylaws. Accordingly, it comes within the
9 ambit of the Peer Review statute and is entitled to immunity.

### D. Defendant Wilson

Defendant argues that Plaintiff's claim against MIHS Chief Executive Officer Walter Shaw cannot survive summary judgment because he was not present at the September 22, 2004 meeting in which they voted to remove Plaintiff from his leadership positions, and therefore did not cast a vote. However, as Plaintiff's point out, they also allege liability against Wilson in his capacity as a member of the Board of Supervisors on a number of grounds other than the vote in question. In particular, they allege liability arising out of the investigations sanctioned against Plaintiff and the transfer of the PIROG letter of sponsorship to St. Joseph's hospital. Wilson Dep., Pl. Resp. to Cty, Ex. 5. He also points to a prior vote by Defendant Wilson against reappointing Plaintiff and renewing his privileges. Id. Defendants have provided no reason why, given this evidence, Plaintiff's claim against Defendant Wilson cannot be maintained.

### E. Defendants MIHS and MCC

Defendants argue that MIHS and MMC should be dismissed as defendants because they are merely departments of Maricopa County and not capable of being legally sued in their own name.

The capacity of a non-individual, non-corporate entity to be sued is determined "by the law of the state where the court is located." Fed. R. Civ. P. 17(b)(3). The statutory notes of A.R.S. § 12-820 state that "it is hereby declared to be the public policy of this state that

public entities are liable for acts and omissions of employees in accordance with the statutes and common law of this state." "Public entity" is defined by that section as "this state and any political subdivision of this state." A.R.S. § 12-820(6). Arizona courts have defined the characteristics of a political subdivision by quoting Lydecker v. Commissioners, 41 N.J.L. 154 (1878), as follows:

> These distinctive marks are, I think, that they embrace a certain territory and its inhabitants, organized for the public advantage, and not in the interest of particular individuals or classes; that their chief design is the exercise of governmental functions . . . . Bodies so constituted are not merely creatures of the state, but parts of it, exerting the powers with which it is vested for the promotion of those leading purposes which it was intended to accomplish, and according to the spirit which actuates our republican system.

Sorenson v. Superior Court, 254 P. 230, 231 (Ariz. 1927) (holding that school districts are community subdivisions); McClanahan v. Cochise College, 540 P.2d 744, 748 (Ariz. Ct. App. 1975) (holding that a community college is a political subdivision).

MIHS and MMC – discrete entities founded to provide health services and exercising power over their employees and management – are such political entities. And, in fact, Arizona courts have repeatedly allowed suits to be maintained against them. See, e.g., Falcon v. Maricopa County, 144 P.3d 1254 (Ariz. 2006); Gomez v. Maricopa County, 857 P.2d 1323 (Ariz. Ct. App. 1993); Roddy v. Maricopa County, 911 P.2d 631 (Ariz. Ct. App. 1996). Defendants argue that "only a county's board of supervisors has the power to sue on behalf of the county." A.R.S. § 11-201. However, they have provided no precedent demonstrating that that provision – which states that "[t]he powers of a county shall be exercised only by a board of supervisors or by agents and officers acting under its authority and authority of law," is intended or has been interpreted to limit suit against political entities. Indeed, none seems to exist. Nor does the fact that the county board of supervisors are given authority to "[c]ause to be erected and furnished a . . . hospital" or "contract with any qualified person to provide all or part of the health services . . . to residents of the county" mean that county hospitals, once established, are not political subdivisions. A.R.S. § 11-251(8),(18). Similarly, that Maricopa County Manager David Smith states that MIHS and MMC were "each agencies, departments or subdivisions of Maricopa County" is not

- 15 -

particularly persuasive, as "political entities" are specifically defined by the relevant Arizona law as "political subdivisions."

Accordingly, Plaintiff may maintain his suit against MIHS and MMC.

### F. Punitive Damages

A.R.S. § 12-820.04 states that "[n]either a public entity nor a public employee acting within the scope of his employment is liable for punitive or exemplary damages." Plaintiff can therefore not recover punitive damages on his state law claims from any public entities or employees acting within the scope of their duties. Plaintiff makes no argument in his Response that Defendant Board Members were not acting within the scope of their duty at any point in the events for which they are liable. As such, Plaintiff is barred from recovering punitive damages on those state law claims.

Plaintiff does not argue that he may recover punitive damages against the County Defendants who are municipal entities for his § 1983 or Title VII claims; Defendants do not dispute that there is no bar to his recovery of punitive damages against the Kunaseks under § 1983 or Title VII, nor against all County Defendants under 42 U.S.C. § 300a-7. Thus, those claims will stand.

Further, Defendants' claim that "summary judgment against plaintiff's punitive damage claim is . . . required because he has failed to establish with clear and convincing admissible evidence that the County Defendants acted with an 'evil mind'" is simply a misstatement of the relevant law. Plaintiff has provide ample factual evidence of Defendants actions to demonstrate a genuine issue of material fact as to their motives and frame of mind, and Defendant has provided no real challenge to that evidence. Whether Defendants acted with the requisite malice, disregard, or callousness required by each statute is a question for the jury.

Accordingly,

**IT IS ORDERED** Defendants' Motion for Summary Judgment shall be **GRANTED IN PART** and **DENIED IN PART** as detailed in this Order.

DATED this 12th day of March, 2009.

Roslyn O. Silver
United States District Judge

- 17 -